Jeremey I. Lessem
Lessem, Newstat & Tooson, LLP
3450 Cahuenga Blvd., Unit 102
Los Angeles CA, 90068
Telephone: (818) 582-3087
Facsimile: (818) 484-3087


Attorney for Richard Pinedo


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| V. | : | Case No.: 18-CR-24 |
| | : | |
| | : | |
| RICHARD PINEDO | : | |


DEFENDANT'S POSITION ON SENTENCING


I.      PROCEDURAL BACKGROUND

Richard Pinedo is before the Court as a result of pleading guilty to a violation of Title 18

USC Section 1028, commonly referred to as identity fraud. The plea was negotiated pre-

indictment and included an agreement to cooperate with the Office of the Special Counsel in its

ongoing investigation. Mr. Pinedo honestly and truthfully fulfilled his obligations under the

agreement, and both sides requested a sentencing date when his assistance was no longer needed.

II.    FACTUAL BACKGROUND

Richard Pinedo is a 28-year-old single man who has lived his entire life in the rural community of Santa Paula, California. Mr. Pinedo has absolutely no prior criminal history and had never left the state of California prior to attending court proceedings in this matter. Mr. Pinedo led a quiet and sheltered childhood. He was raised in a middle-class household where his mother, Norma, worked at K-Mart while his father, Richard Sr., worked first for the California Air National Guard and then later in the agricultural industry as a bookkeeper [Mr. Pinedo's father, has written a letter on his son's behalf, attached hereto as **"Exhibit 1"**]. Mr. Pinedo has two younger siblings, Kevin and Melissa, whom he helped raise during his parents' frequent absence due to work.

Mr. Pinedo and his siblings spent a good deal of time in the family home alone, while his parents worked long hours to support the family. As a young man with limited parental involvement and little to do in the small agricultural town where he grew up, Mr. Pinedo found himself drawn to the computer. What first started as an interest in video and computer games, later grew to a desire to learn computer science and programming. After attending Catholic School up to the eighth grade, Mr. Pinedo transferred to Santa Paula High School where he graduated in three years. After high school, Mr. Pinedo enrolled at Ventura County Community College, where he studied computer science. Over the course of several years, Mr. Pinedo completed 143 credit hours, coming just shy of earning his associates degree.

While studying computer science, Mr. Pinedo's interest in computers and his entrepreneurial spirit led him to earn money by selling items on the auction website, "Ebay." In addition to selling his own belongings, Mr. Pinedo went on to help is friends and neighbors sell

their own items on the website. For a small percentage of the sale price, Mr. Pinedo handled all aspects of the Ebay transaction, including photographing the item, listing the item, and eventually shipping the item once the sale was completed. This side business was a source of some modest income for Mr. Pinedo. This business venture was interrupted when Pay Pal, the financial company processing his online payments, suspended his online account. To Mr. Pinedo, the suspension of his account was arbitrary. Distressed by the loss of income, Mr. Pinedo appealed the suspension. Eventually, his account was reinstated, but only after weeks of emails and phone calls with company representatives.

This unfortunate experience with Pay Pal, and its seemingly unfettered ability to arbitrarily cut-off individual financial accounts, gave rise to the idea that would become "Auction Essistance." Mr. Pinedo surmised that he was not the only one experiencing these types of issues. He also suspected that the people finding themselves in these situations were not as persistent or computer savvy as himself.

As discussed in detail in previous filings, online payment processors such as Pay Pal, submit clients to a specific verification process before they can receive and submit online payments. This generally entails having the potential client provide bank account information. The authenticity of the bank account is then verified when Pay Pal makes two negligible deposits into the account followed by a request that the user provide the company with the details of those deposits. When the potential client submits to Pay Pal the amounts of these deposits the account is verified.

Mr. Pinedo's enterprise essentially entailed providing "customers" of Auction Essistance with bank account and deposit information so that they could establish verified Pay Pal accounts

without the need of providing personal bank account information. Mr. Pinedo would first provide

a valid bank account number. Once that number was submitted by the client, Mr. Pinedo would

monitor the account until the Pay Pal deposits were made. He would then provide the deposit

information to the customer so the verification process could be finalized.

In the beginning, the checking accounts Mr. Pinedo provided were accounts he personally

opened in his own name. He would open several different checking accounts at various banks

with the express purpose of utilizing the account numbers in the manner described above.

However, eventually the demand for account information outpaced his ability to open bank

accounts under his own name. It was at this point that he needed to find account numbers from

other sources.

Eventually, Mr. Pinedo found a couple of individuals online who were seemingly able to

provide unlimited numbers of anonymous bank account information that could be used for

purposes of verifying Pay Pal accounts. With these new sources, Mr. Pinedo became a middle-

man, purchasing bank account numbers from third parties and re-selling that information to his

own customers with a small mark-up. When the verification deposits were made by Pay Pal into

these third-party accounts, Mr. Pinedo would obtain the deposit information from the third-party

seller and then pass that information along to his customer. Once the authentication process was

complete, the account information was discarded.

When utilizing bank account numbers from third party sources, Mr. Pindeo never had

access to anything other than the account numbers themselves. He never had access to names,

social security numbers, addresses or any other information tying these accounts to actual

people. Other than the confirming deposits from Pay Pal, no money was ever deposited or

withdrawn from these accounts. As far as Mr. Pinedo was aware, the existence of these bank accounts served no other purpose than to authenticate Pay Pal accounts. In all likelihood, the actual owners of the accounts used were completely unaware of the existence of these bank accounts, and never had any money in these accounts that could have been stolen. As a result, there is no discernible loss to any individual victims in this case, but rather, the agreed upon "loss" for sentencing guideline purposes has been calculated by the amount of Mr. Pinedo's ill-gotten gains from the enterprise; an estimated $40,000 collected over a three to four-year period of time.

Mr. Pinedo never thought himself a thief, nor was it his intention to steal. No money was ever stolen from the accounts of anyone. Whenever he was approached with requests for identifying information related to the bank accounts (such as names, date of births or social security numbers) Mr. Pinedo flatly refused. Absent direct theft, Mr. Pinedo naively deluded himself into believing that he was providing a service to those that wanted to earn a living on auction sites such as Ebay (hence the business name Auction Essistance) rather than committing an outright crime. Mr. Pinedo saw his customers as individuals who relied on sales auction sites such as Ebay to make ends meet but were prevented from doing so because of the arcane, and often incomprehensible, rules and regulations of online financial corporations like Pay Pal, not as criminals potentially looking to commit fraud.

Unfortunately, Mr. Pinedo intentionally failed to think about why the authentication process was established in the first place, and what damage could be done by those he helped to fraudulently circumvent these procedures. Mr. Pinedo intentionally avoided learning about the use of the fraudulent accounts he was helping to establish, and in so doing crossed over from

gross naivete to clear criminal conduct. While the vast majority of those utilizing the services of Auction Essistance may have had an innocent purpose, all were committing fraud, and as we now know, a select few were doing far worse.

When Mr. Pinedo undertook his illegal and misguided business venture of Auction Essistance, he didn't picture his customers using his services to commit crimes. Mr. Pinedo obviously should have invested more thought into the possible nefarious intentions of those that sought his services. However, never in his wildest dreams could he have foreseen that providing bank account information to set up Pay Pal accounts could be used to interfere with a presidential election. Mr. Pinedo now understands that in a direct and meaningful way, his illegal behavior aided those that sought to undermine American democracy - a fact Mr. Pinedo deeply regrets and will be forced to live with for the rest of his life.


III.     COOPERATION AND REMORSE

Unlike many involved in the Special Counsel Investigation, Mr. Pinedo was truthful and honest with government investigators from the outset. The first time Mr. Pinedo became aware of the investigation was when a search warrant was executed on his family home in December of 2017. At that time, without consulting an attorney, Mr. Pinedo truthfully acknowledged sole ownership of the Auction Essistance website, and fully answered all questions of the Federal law enforcement officers executing the warrant.

Later, and without immunity or any promises of leniency, Mr. Pinedo agreed to a full proffer with attorneys and investigators from the Special Counsel's Office. Following his proffer, Mr. Pinedo testified before a Federal Grand Jury investigating Russian interference with the

2016 Presidential election. Once again, this testimony was truthful and provided without immunity or any promises of leniency. It is this testimony that assisted in the indictment of 13 Russian nationals and 3 business entities.

While at the time of the underlying criminal behavior, Mr. Pinedo may have been unaware of these serious implications, but by the time he agreed to sit down with the Special Counsel's Office and proffer, the gravity of what he was involved in was not lost on anyone. Mr. Pinedo agreed to testify under oath to the grand jury knowing full well that he was providing evidence connecting Russian nationals with the anonymous accounts they were using to unlawfully effect the 2016 presidential election. With his eyes wide open, Mr. Pinedo agreed to provide this evidence, knowing full well that testifying against foreign agents, especially Russian foreign nationals potentially working directly for the Kremlin, meant putting his own safety at serious risk.

As a result of the cooperation provided in this case, Mr. Pinedo lives in a constant state of fear, for his own safety and that of his family. The location of his family home has been posted online. He is not in a financial position to move and thus remains trapped in a home that leaves him open to constant harassment. His old cell phone number and work history have also been published by various websites. He has received death threats. Members of the media have come to his family home, and Mr. Pinedo even believes that on several occasions strange unidentified vehicles have parked and waited outside his house. Due to safety concerns related to this case, Mr. Pinedo wouldn't even consider traveling outside the country, and often suffers severe anxiety simply driving through his own neighborhood.

As with any cooperating witness facing criminal exposure, this cooperation can be interpreted as an act motivated by self-interest. Mr. Pinedo certainly understood that his cooperation could provide potential legal benefits at a later stage in the proceedings. However, the mere act of providing publicly incriminating evidence against Russian nationals accused of undermining an American presidential election is not an undertaking one embarks on lightly, no matter what potential benefits may result. Indeed, in a time when those critical of Russia are being murdered, and those who defend Russia in the United States are threatened with violence, Mr. Pinedo's cooperation with the investigation was an act that directly undermined his, and his family's, safety.

IV.     FACTORS PURSUANT TO U.S.C. SECTION 3553(a)

Title 18, United States Code, Section 3553(a) requires that the Court impose a sentence that is, "sufficient, but not greater than necessary," to comply with the purposes of sentencing. Here, given the totality of the circumstances, a non-custodial sentence best complies with these requirements.

Mr. Pinedo fully accepts his responsibility for the wrongfulness of his conduct. He understands that by assisting others in creating anonymous Pay Pal accounts he opened the door for others to commit harmful and illegal acts. Mr. Pinedo is devastated that his conduct allowed others to do something as nefarious as to defraud this country and undermine its electoral process. The serious repercussions of his actions are very real to Mr. Pinedo, and he is genuinely remorseful for his actions.

Mr. Pinedo has demonstrated this remorse by fully and honestly cooperating with the government from the outset. He accepted full and complete responsibility from the moment federal law enforcement officers executed the warrant at his home. Later, he both proffered and testified to a grand jury, without immunity or promises of leniency. Mr. Pinedo's testimony provided evidence that led to the indictment to 13 Russian nationals and 3 business entities that interfered in the 2016 Presidential Election. Additionally, Mr. Pinedo directly implicated the suppliers of the anonymous bank information he was re-selling. Mr. Pinedo's testimony in this regard constitutes further substantial cooperation, and has provided the government with ample opportunity to pursue these individuals should they be motivated to do so. Finally, Mr. Pinedo's cooperation provided crucial insight into internal flaws embedded in the online financial verification system. Flaws that government and private industry have already taken steps to correct.

There is simply nothing more Mr. Pinedo could have done to remedy the wrongfulness of his actions. Further, Mr. Pinedo continues to stand ready to assist the government should anyone associated with this case ever be arrested or prosecuted in the future.

Moreover, Mr. Pinedo has already suffered severe consequences from his conduct that go well beyond what one would suffer for this type of crime under normal circumstances. Mr. Pinedo is seen by some as a traitor, and in retaliation, his name and personal information have been published internationally online. Online harassment and threats through social media and related avenues have forced Mr. Pinedo off-line completely. Even his home address can be found with a simple Google search. Mr. Pinedo lives in constant fear; fear for his safety, as well as for that of his family; fear of the Russian government, and what they have done in the past to those

that have incriminated them; fear that employers won't consider hiring him due to his unwanted notoriety; fear that he may never be able to return to the simple anonymous life he enjoyed before any of this ever happened. Even Mr. Pinedo's father, who shares the same name, has suffered harassment and discrimination at work as a direct result of his son's indictment. Only a very understanding and loyal employer has kept Mr. Pinedo, Sr. employed in his current occupation.

Beyond the mere fact that he is now a convicted felon, Mr. Pinedo has suffered, and will continue to suffer, in ways far beyond what anyone else convicted of a similar offense would expect – and suffers these consequences as a result of helping this Country right the wrong his unwitting and foolish criminal conduct facilitated. At the end of the day, Mr. Pinedo loves his Country, deeply regrets what he has done, and asks only that this Court consider that he has already suffered enough.


V. CONCLUSION

Based on the above stated facts, Mr. Pinedo respectfully requests this Court impose a non-custodial sentence. While Mr. Pinedo's family has already suffered significant financial hardship as a result of this case, they are willing to assist Mr. Pinedo in the payment of a court imposed fine. Additionally, Mr. Pinedo will agree to any conditions of probation this Court deems appropriate.

Date:   9/26/18                                   /S/ Jeremy I. Lessem

                                                  LESSEM, NEWSTAT & TOOSON, LLP
                                                  Attorneys for Richard Pinedo

# Law Offices of
# Lessem, Newstat & Tooson, LLP

EXHIBIT 1

September 7, 2018

To the Honorable Judge Dabney L. Friedrich,

My wife Norma and I are writing this letter on behalf of our son Ricky Pinedo. We are pleading with this Court to please not put our son Richard Pinedo Jr. in custody. Ricky has been a great son. He is reliable, respectful and loving. He has never been in a fight, he doesn't drink alcohol or take drugs. This is the first time he has been in trouble with the law. We fully understand that Ricky has made a terrible mistake. However, we also know that he is genuinely remorseful, and has made every effort to take full responsibility for his actions.

I was in the California Air National Guard and my wife worked at Kmart in Santa Paula during Ricky's childhood. Although I did not spend a lot of time with him before I retired in August 2001, my wife and mother-in-law did a great job taking care of him. Ricky attended private Catholic School though the 8th grade, after which he graduated from Santa Paula High School in only 3 years.

During his teenage years, with my wife and I often at work, Ricky was a huge help to the family by babysitting his younger brother Kevin and sister Melissa. Ricky fed them, cleaned the house and cut grass without being told. He was always very mature and responsible for his age. Even though he had a shy personality, Ricky had a lot of friends. My son participated in youth baseball and basketball leagues from the age of 5 to 13. He excelled in both. He was considered an excellent pitcher in baseball and an outstanding rebounder in basketball. During high school he did not participate in sports in order to concentrate on graduating early. He even attended evening classes at Ventura Community College while still in high school.

After high school, Ricky he attended Ventura Community College for 2 years. He then tried obtaining employment during the recession of 2008. He worked has a personal trainer and help desk representative for a tech company. Due in large part to the state of the economy at the time, neither of these jobs worked out. Ricky then started his internet business with the startup capital my wife and I gave him. Ricky thought his business was helping people to earn a living and make money on the internet. He never dreamed that what he was doing could ever be used by anyone in such a harmful way.

We have been lucky to have a loving, responsible son that has never given us problems. This incident took everyone by surprise since he is the last person any of us thought would ever get into any kind of legal trouble. I know that my son made a serious mistake, but Ricky has learned from this experience and will never do anything like this again. Additionally, what he has

already had to endure as a result of this case has been horrible. He is now a convicted felon, and his name and picture has been posted all over the world. I just hope that when eventually all of this starts to die down, my son and the rest of the family can go back to living our normal lives.

I truly believe that my son Ricky has already been punished enough. Please place him on probation without any prison time. This awful experience has already been extremely hard on my family financially, but we are willing to pay a fine or do whatever else is needed to help keep him out of jail.

Thank you for considering this letter or behalf of my son.

Sincerely,

Richard Pinedo, Sr.