```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
     UNITED STATES OF AMERICA,        .
 3                                    .  Case Number 18-cr-24
                Plaintiff,            .
 4                                    .
           vs.                        .
 5                                    .  Washington, D.C.
     RICHARD PINEDO,                  .  October 10, 2018
 6                                    .  10:08 a.m.
                Defendant.            .
 7     - - - - - - - - - - - - - - - -

 8
                     TRANSCRIPT OF SENTENCING
 9          BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                  UNITED STATES DISTRICT JUDGE
10

11   APPEARANCES:

12   For the Government:            LAWRENCE RUSH ATKINSON, AUSA
                                    JEANNIE SCLAFANI RHEE, AUSA
13                                  RYAN KAO DICKEY, AUSA
                                    U.S. Department of Justice
14                                  Special Counsel's Office
                                    950 Pennsylvania Avenue Northwest
15                                  Washington, D.C. 20530
                                    202-616-0800
16

17   For the Defendant:            JEREMY LESSEM, ESQ.
                                    Lessem, Newstat & Tooson, LLP
18                                  3450 Cahuenga Boulevard
                                    Unit 102
19                                  Los Angeles, California 90068
                                    818-582-3087
20

21   Official Court Reporter:      SARA A. WICK, RPR, CRR
                                    U.S. Courthouse, Room 4704-B
22                                  333 Constitution Avenue Northwest
                                    Washington, D.C. 20001
23                                  202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

```
1                        P R O C E E D I N G S

2           (Call to order of the court.)

3                 COURTROOM DEPUTY:  Your Honor, this is Criminal Case

4      Number 18-24, *the United States of America versus Richard*

5      *Pinedo*.  The defendant is present.  And on behalf of the

6      Probation Office is Kelly Kraemer-Soares.

7           Will counsel, please, approach the podium and identify

8      yourselves for the record, as well as any additional parties at

9      your table.

10                MR. ATKINSON:  Good morning, your Honor.  Rush

11     Atkinson on behalf of the United States.  With me at counsel's

12     table is Jeannie Rhee and Ryan Dickey.

13                THE COURT:  Good morning, Mr. Atkinson.

14                MR. LESSEM:  Good morning, your Honor.  Jeremy Lessem

15     on behalf of the defendant, Richard Pinedo, Jr., who is present

16     at counsel table.

17                THE COURT:  Good morning.

18          All right.  We are here for the sentencing of the

19     defendant, Mr. Pinedo.  Are both parties ready to proceed?

20                MR. ATKINSON:  The government is, your Honor.

21                MR. LESSEM:  The defense is ready, your Honor.

22                THE COURT:  Okay.  I've reviewed the final presentence

23     report and recommendation.  I've also reviewed the parties'

24     sentencing memoranda, the initial and the supplemental memoranda

25     that you filed in response to my question regarding the
```

1    application of the two-level victim enhancement under the

2    guidelines.  I've also read the letter that Mr. Pinedo's father

3    submitted on his behalf with his wife.

4        And I'm wondering, are there any other documents that I

5    should review?

6              MR. ATKINSON:  None from the government, your Honor.

7              MR. LESSEM:  No, your Honor, no further documents from

8    the defense.

9              THE COURT:  All right.  Mr. Lessem and Mr. Pinedo,

10   have you read the presentence report?

11             MR. LESSEM:  Yes, we have.

12             THE COURT:  Mr. Pinedo, are you fully satisfied with

13   your attorney?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you feel you've had enough time to talk

16   to him about the presentence report and the memoranda that have

17   been filed in this case?

18             THE DEFENDANT:  Yes.

19             THE COURT:  All right.  Mr. Lessem, are there any

20   issues in dispute with respect to the PSR?

21             MR. LESSEM:  No, your Honor, there's no issues in

22   dispute with respect to the PSR.

23             THE COURT:  And any factual inaccuracies that I need

24   to correct?

25             MR. LESSEM:  There was one issue, your Honor, with the

1    PSR that I spoke with counsel about earlier today.  I believe it

2    was paragraph 42.  It had to do with restitution and talked

3    about -- had some information regarding victims, which I believe

4    is not completely substantiated or accurate, and I believe that

5    the government agrees with me on this point.

6              THE COURT:  Is this the information about the three

7    banks and the 12 individuals?

8              MR. LESSEM:  Yes.

9              MR. ATKINSON:  Yes, Judge.

10             THE COURT:  And is it the government's position that

11   you can't prove that right now?

12             MR. ATKINSON:  Your Honor, at this point we cannot

13   prove that the 12 individuals were victims of identity theft.

14   We have identified 12 Social Security numbers and what we

15   believe are real U.S. person names.  We have reached out,

16   pursuant to our victim notification obligations, to the 12

17   individuals.  We have made contact with a handful of those

18   individuals but have not been able to speak with more than half

19   of the individuals at this time.  So we don't believe that the

20   enhancement should apply at this time.

21             THE COURT:  Okay.  So just to be clear, at this point

22   the government cannot prove that there are more than 10 victims

23   in this case?

24             MR. ATKINSON:  Correct, your Honor.  That's our

25   position.

1        THE COURT:  All right.  Mr. Atkinson, you've reviewed

2   the PSR.  Are there any issues in dispute from your perspective?

3        MR. ATKINSON:  No, your Honor, other than --

4        THE COURT:  Any other additional factual inaccuracies?

5        MR. ATKINSON:  None other than the caveat I just gave

6   you on paragraph 42.

7        THE COURT:  Okay.  As you all know -- under Rule 32, I

8   will accept the presentence report as my findings of fact.  As

9   you all know, the sentencing guidelines apply in this case, but

10   in light of the Supreme Court's decision in *U.S. v. Booker*, the

11   guidelines are not mandatory.  Although they are advisory, I

12   must consider them.  So consistent with Supreme Court decisions,

13   I will first calculate the sentencing guideline range.  Once

14   I've done so, I will consider the guidelines, as well as the

15   other relevant 3553(a) factors to determine the appropriate

16   sentence in this case.

17        According to the presentence report, the relevant guideline

18   is Section 2B1.1, because Mr. Pinedo has pled guilty to one

19   count of identity fraud in violation of 18 U.S.C. 1028(a)(7) and

20   related provisions.  As set forth in the presentence report, the

21   base offense level under 2B1.1(a)(2) is a level 6.  The

22   six-level enhancement applies under 2B1.1(b)(1)(D) for the

23   amount of gain in this case.  The two-level enhancement also

24   applies under 2B1.1(b)(10)(B) because a substantial part of the

25   fraudulent scheme was committed outside of the United States.  A

1    two-level enhancement applies under 2B1.1(b)(11)(C)(ii) because

2    the offense involves the unauthorized possession of five or more

3    means of identification that were unlawfully obtained by the use

4    of another means of identification.  That makes the adjusted

5    offense level a 16.

6         Pursuant to Sections 3E1.1(a) and (b), Mr. Pinedo is

7    eligible for a three-level reduction based on his timely

8    acceptance of responsibility.  This results in a total offense

9    level of 13.

10        The PSR indicates that Mr. Pinedo has no criminal history,

11   and thus, he falls within a criminal history category of I.

12   This results in a guideline range of 12 to 18 months.

13        Before going further, I would like to hear from both

14   parties on the guideline calculations.  First, Mr. Atkinson,

15   we've spoken about the victim enhancement.  I also want to ask

16   you about loss in this case.  The probation officer calculates

17   the loss as greater than $40,000 and less than $95,000, and the

18   government, I understand, has represented that it cannot make a

19   reasonable estimation of the loss in this case and that,

20   therefore, the Court should consider gain as an alternative

21   measure of loss; is that correct?

22        MR. ATKINSON:  That's correct, your Honor.  As in many

23   identity theft cases, it's difficult to measure how much a

24   victim has suffered in terms of these people haven't been

25   defrauded out of money but, rather, suffer loss as a result of

1    having their credit ratings devalued and other such ancillary

2    effects.  We think that the gain is the, basically, better

3    measure in this case.

4          THE COURT:  Can you tell me how you calculated gain in

5    this case?  Did you do anything to independently verify what

6    Mr. Pinedo told you about the gain?

7          MR. ATKINSON:  We at this point also looked at what

8    Mr. Pinedo was earning per bank account -- it was about $40;

9    backing out what he paid in those cases, he paid less than $40,

10    usually $10 to $20, if I remember -- and looked at the number of

11    accounts that we -- the accounts that we could identify, the

12    account numbers that he sold.  It seemed like a reasonable

13    approximation.

14          THE COURT:  Okay.  And in terms of a fine in this

15    case, do you agree that he doesn't have the ability to pay a

16    fine?

17          MR. ATKINSON:  We do, your Honor.  We believe that a

18    fine here would be borne by his parents and, therefore, may not

19    be appropriate in this case.

20          THE COURT:  So can you tell what happened to the $40-

21    to $95,000 he made over the course of three years?

22          MR. ATKINSON:  We believe this was Mr. Pinedo's only

23    means of subsistence during those four years, as far as we can

24    tell.

25          THE COURT:  But he's living at home?

1      MR. ATKINSON:  We think he spent it, your Honor.  We

2 know that he bought at least two vehicles that we've identified

3 and Probation identified.  There are other expenses that were

4 identified.  We think it simply just isn't there.

5      THE COURT:  Okay.  With respect to cooperation,

6 Mr. Atkinson, the plea agreement contemplated the possibility

7 that the government would file a 5K1.1 substantial assistance

8 motion but not a Rule 35 motion.  According to your sentencing

9 memorandum, Mr. Pinedo did provide significant assistance to the

10 government and saved you significant time and resources.  I

11 understand from his sentencing memorandum that he also testified

12 before the grand jury.

13      Can you elaborate on how he saved you time and resources,

14 and can you explain to me what the difference

15 between "significant" and "substantial" cooperation is.

16      MR. ATKINSON:  Yes, your Honor.  We thought about this

17 in three parts.  First off is the government's investigation

18 into Mr. Pinedo's own misconduct.  In this case the government

19 asked one agent to go out to California to interview Mr. Pinedo.

20 During that initial interview, Mr. Pinedo admitted his own

21 misconduct, agreed to fly to the District of Columbia in order

22 to meet with the government.  He also arranged for counsel to

23 come over to the District of Columbia.

24      In that first meeting, Mr. Pinedo was forthright.  He

25 admitted his own misconduct.  It was, I would say, frankly, your

Honor, pretty close to the unvarnished truth, much better than you get in most first interviews with a defendant.  He identified how the scheme worked, which the government, frankly, at that time did not have a full appreciation of, where Mr. Pinedo was getting these bank account numbers that weren't his own.  And then he was able to identify his upstream seller, as we described it in the supplemental memorandum.

So that was -- he also subsequently, at the government's request, voluntarily produced records that the government did not possess related to his contact with upstream sellers.  It was chat communications that he had on his own computer.  He voluntarily produced those chats, as well as made his computer available.

So that was his own misconduct, Judge, and I would say that in a normal course, in a normal investigative office, he would have -- we would assess that Mr. Pinedo had provided substantial assistance vis-a-vis his upstream sellers.  If this was just a normal fraud prosecution, he would have identified people above him that were more culpable, and he would have led probably to the charges of other individuals.

THE COURT:  Did he, in fact, implicate other folks?

MR. ATKINSON:  He did, your Honor.

THE COURT:  And the government could pursue them?

MR. ATKINSON:  It could pursue them.  However, given the mandate of the Special Counsel's Office, the Special

1    Counsel's Office did not pursue those because they did not

2    relate to our core mission.

3              THE COURT:  But why can't they be referred to another

4    U.S. Attorney's Office to pursue?

5              MR. ATKINSON:  Without speaking to what has actually

6    happened in this case, in the normal course, the Special

7    Counsel's Office has been referring information like this to

8    other U.S. Attorney's Offices to prosecute and investigate.  At

9    this stage, we don't believe that there has been a sufficient

10   investigation in this case to warrant a 5K.

11       And then with respect to, I think, Mr. Pinedo, on the third

12   part in his filings, has suggested that he provided substantial

13   assistance to the indictment of *the United States versus*

14   *Internet Research Agency LLC*.  Your Honor, at this point the

15   government doesn't believe that his assistance was significant

16   enough to raise to the level of 5K.

17             THE COURT:  Has he agreed to testify in any future

18   trial?

19             MR. ATKINSON:  He has, your Honor.  That's a part of

20   his cooperation agreement.  However, the government at this

21   stage -- frankly, the government knew the information that

22   Mr. Pinedo provided vis-a-vis the Russian individuals that are

23   charged there.  So we don't believe that it is appropriate in a

24   5K.

25             THE COURT:  Is there any question that the information

1     he's given you is truthful?

2            MR. ATKINSON:  We have every reason to believe that

3     the information that he has provided is truthful and fully --

4     and fulsome.

5            THE COURT:  And his information could well lead to

6     future prosecutions?

7            MR. ATKINSON:  Could well lead, yes, exactly right.

8            THE COURT:  And yet, the government will not at any

9     point commit to filing a Rule 35 motion?

10           MR. ATKINSON:  Judge, I think Rule 35 would be

11    considered down the line.  I just don't think that the

12    government can commit at this point, given --

13           THE COURT:  No, I understand, but the plea agreement

14    seems to preclude that.

15           MR. ATKINSON:  That's not how I would read the Rule

16    35, Judge.  It just leaves open.  It's no obligation for a Rule

17    35.

18           THE COURT:  Okay.  Mr. Pinedo claims that his

19    cooperation revealed flaws in the online financial verification

20    systems that both not only private industry but also the

21    government has benefited from.

22         Is that true?  Have you taken steps to correct

23    vulnerabilities?

24           MR. ATKINSON:  So the government hasn't taken steps.

25    The government has notified private industry of what we saw as a

1    potential lapse, including the three financial institutions that

2    were identified in the probation report -- or the presentence

3    report, excuse me.  And we understand that private industry has

4    taken steps to tighten up their security functions.

5              THE COURT:  So you're not filing a 5K1.1 motion?

6              MR. ATKINSON:  Judge, this is simply our technical

7    reading of the 5K1.1.  It's just not appropriate in this

8    circumstance.  That's not to undersell Mr. Pinedo's cooperation

9    and acceptance of responsibility.

10              THE COURT:  So he really is prejudiced by being a part

11   of this investigation as opposed to a regular U.S. Attorney's

12   Office investigation?

13              MR. ATKINSON:  Prejudiced is maybe a little extreme,

14   Judge, because there are other investigations that simply -- or

15   there are other specific instances in which the U.S. Attorney's

16   Office wouldn't be interested in the information that Mr. Pinedo

17   provided.  But we think a prosecuting office that had a wider

18   ambit, that might possibly be right.

19              THE COURT:  But without revealing too much, you would

20   provide this information to another office?

21              MR. ATKINSON:  Correct, your Honor.

22              THE COURT:  Any other departures you're seeking under

23   the guidelines?

24              MR. ATKINSON:  No, Judge.

25              THE COURT:  I want to hear from Mr. Lessem on the

1    guideline calculation, and then I have a few more questions for

2    you.

3             MR. ATKINSON:  Yes, Judge.

4             THE COURT:  Mr. Lessem, anything you would like to add

5    regarding the guideline calculation in this case?  I take it you

6    have no objections, you agree with the Probation Office's

7    calculations here?

8             MR. LESSEM:  I do, your Honor.  With the calculations,

9    I have no issues.

10            THE COURT:  Okay.  And you're not seeking any

11   guideline departures?

12            MR. LESSEM:  No.  I do want to address what counsel

13   just spoke about, when I have the opportunity.

14            THE COURT:  You may do so, in terms of substantial

15   assistance.

16            MR. LESSEM:  Correct.  I appreciate what the

17   government had to say up here.  I would have preferred that to

18   have been in writing and something that the Court could have

19   known about prior to us coming to court for oral argument.

20            THE COURT:  I do think that they did reveal enough

21   that that was my suspicion here, that he had provided full and

22   truthful information that could potentially lead to other

23   prosecutions but at this point in time has not.

24            MR. LESSEM:  And obviously, I don't know the details

25   of the government's Russia investigation and exactly what they

did or didn't know prior to Mr. Pinedo providing information to them.

What I do know is when he agreed to come out to the District of Columbia to proffer, that the proffer centered around the identities of Russian individuals who were using the services that he was providing, and I believe that whatever he had to say with respect to this investigation was important enough where they felt it useful enough to bring him out to D.C. to testify in front of the grand jury who was investigating these activities.  And if the information that he had was already known or known by other sources, it's hard for me to understand what the point of flying him out to D.C. on taxpayer dime to testify in front of that grand jury did.

THE COURT:  They did come to him.  So they had enough information to know he was involved, presumably, through paper alone.  But I'm sure he added a story to --

MR. LESSEM:  Right.  I agree with the Court. Obviously, there's a lot that they did know.  I believe, from my small section of this case, that he provided useful information, information that helped make connections between anonymous individuals and who these people actually were.  And I think 5K would have been appropriate given that.

And I also agree with the Court's characterization that with respect to providing information about people upstream above him, people who are potentially more culpable for this

1    type of activity than he was, that he is sort of being

2    prejudiced by the fact that Special Counsel hasn't prosecuted

3    those individuals or referred those out for further prosecutions

4    where he could have provided substantial assistance in that way.

5         I think that --

6              THE COURT:  I'm not sure that they haven't referred

7    them.  I think that there's a possibility others can be

8    prosecuted in the future.  But like so often is the case with

9    cooperators, it's not always at the time of sentencing that that

10   has happened.

11             MR. LESSEM:  Right.  And I don't know if they have or

12   not, but my understanding is it's something that hasn't been

13   pursued at this point when normally, I think, it would have been

14   by now.

15             THE COURT:  It's certainly something that I can

16   consider in fashioning the sentence here.  I have no

17   authority -- it's within the sole discretion of the government

18   to file a 5K1.1 motion.  So I have no authority to second-guess

19   that.  But it is something that I can consider in fashioning an

20   appropriate sentence here, and I intend to.

21             MR. LESSEM:  Absolutely.  I understand that.  Thank

22   you, your Honor.

23             THE COURT:  All right.  Thank you.  Anything else on

24   the guidelines?

25             MR. LESSEM:  No, not with respect to the guidelines.

1    THE COURT:  Okay.  Let me ask you this:  With respect

2    to a fine, I understand he doesn't have the ability to pay a

3    fine.  Restitution, it's impracticable to calculate here.

4    MR. LESSEM:  Right.  I agree with the government's

5    position in terms of, you know, calculating restitution.  The

6    amount of loss here was calculated based on earnings.  I would

7    just point out to the Court that those earnings, the $40,000

8    that we estimated, is basically over a three-and-a-half-year

9    period.  So we're talking about --

10    THE COURT:  His conversation with the probation

11    officer -- I did the math -- ranges from $55- to $135,000,

12    depending how it cuts.  It's a substantial amount of money.  I

13    don't think it's 40- in this case.  It's somewhere in the range

14    of, you've agreed, 40- to 95-.  So even that extended over three

15    years is a significant amount of money.

16    MR. LESSEM:  I believe that Mr. Pinedo's testimony in

17    the proffer and what -- I believe the earnings were closer to

18    40- than the higher end of that range, spread over a three-year

19    period, and that was, you know, not a huge amount of money,

20    considering the time that had gone by and the time that this was

21    taking place.

22    He does not have the ability to pay a fine himself.

23    However, if the Court was going to consider a fine in lieu of

24    other types of punishments, the family would be willing to

25    contribute as much as they could on his behalf to help --

1          THE COURT:  I appreciate that.  I don't expect that of

2     the family here.

3          In terms of numbers of bank accounts, you all have thrown

4     out "hundreds."  Hundreds, closer to 200 or 1,000?

5          MR. LESSEM:  I think the government would know that

6     better than me.  I think it's around a couple of hundred.  100

7     to 200 is what my information is.  But they may have done an

8     additional investigation in that area that I'm not aware of.

9          THE COURT:  All right.  Thank you, Mr. Lessem.

10          MR. LESSEM:  Thank you.

11          THE COURT:  Mr. Atkinson, if you can speak to that

12     point, when we talk about "hundreds," what do you really mean?

13          MR. ATKINSON:  Judge, so with respect to Mr. Pinedo's

14     own bank accounts that he sold -- that he opened in his own

15     name, we don't have a lot of visibility into that because we

16     just didn't have the records for it.  We understand that was the

17     2014 to 2015 period.  We still consider that a part of the

18     fraud.  The government's position is that that is just aiding

19     and abetting in the commission of wire fraud.

20          So setting those aside, for the third parties, we think

21     it's closer to 200.  We identified 12 victims as we were able

22     to -- or 12 Social Security numbers that were used in the

23     commission of this crime.  Each of those had a dozen to two

24     dozen bank accounts that we could identify.  As we identified to

25     the Court in the supplemental briefing, we could not garner

1    records from other financial institutions.  We think that might

2    be because they were shut down very quickly.  But when we put

3    everything together and we looked through Mr. Pinedo's e-mails

4    that he provided to us and his other correspondence, we think

5    it's in the range of 200 or so.

6         THE COURT:  Okay.  In terms of the government's

7    sentencing recommendation, you've made no recommendation

8    whatsoever.  At the time of the plea, you and the defense agreed

9    that a sentence within the guideline range would constitute a

10   reasonable sentence in light of all the factors set forth in

11   3553(a).

12        What's changed since that time?

13        MR. ATKINSON:  Your Honor, we are just deferring to

14   the Court, I think, in this case, given the circumstances.

15   Mr. Pinedo has continued to provide information.  He has

16   fulfilled his obligations.  We think that -- I think we've laid

17   out why there isn't a 5K in this situation, and we think that

18   your Honor is exactly right to consider his cooperation even if

19   there's not a technical 5K in front of you.  We wouldn't oppose

20   that.  We don't think it's inappropriate.

21        THE COURT:  Can you give me anything?  Is a sentence

22   of imprisonment appropriate here?  I don't even have that from

23   the government, and you know this case better than anyone.

24        MR. ATKINSON:  Yes, Judge.  We have -- in other cases

25   the Special Counsel's Office has deferred to the Court more in

1    this.  On the other hand, we have the better facts, but you have

2    been on the Sentencing Commission and have seen a wide variety

3    of fraud cases that are measured under 2B1.1.

4        I can give you, I think, a couple of factors that we were

5    hoping to identify to the Court that may situate Mr. Pinedo's

6    culpability a little bit more.

7        One thing, for example, is I think in Mr. Pinedo's

8    sentencing paper -- sentencing memorandum, he suggested that he

9    thought his customers were engaged in innocent activity

10   exclusively.

11              THE COURT:  I don't find that credible.

12              MR. ATKINSON:  And we would just give you one thing

13   that Mr. Pinedo testified about in his grand jury testimony, and

14   we have correspondence that supports this.

15       In January 2016, for example, Mr. Pinedo received an e-mail

16   from what he calls a customer, and that customer wrote, "I need

17   to buy documents for photo ID and proof of address.  Do you

18   offer this service?"  Mr. Pinedo testified in the grand jury

19   that he understood this to be that his customer was looking for

20   forged documents.  Mr. Pinedo responded in the e-mail that he

21   himself did not offer this service but directed him to a third-

22   party website that did offer forged documents.  And then he

23   added in the e-mail, "You can contact him," meaning the

24   forger, "and let him know we referred you.  He's a very good

25   seller on quality documents."

1          So we believe Mr. Pinedo understood, maybe not the full

2     extent of the criminal activities engaged in by some of his

3     purchasers, but at least had some understanding that these

4     weren't individuals just looking to get back into the mercantile

5     game and PayPal and eBay.

6          That said, Mr. Pinedo himself, we don't have any evidence

7     that he directly bought or purchased fake IDs -- excuse me,

8     Social Security numbers, nor did he -- we have no evidence that

9     he was directly aware of it.  We do believe that he committed a

10    very obvious ostrich defense, didn't ask and didn't want to know

11    where these accounts were coming from, and therefore, he's

12    criminally liable, though.

13          THE COURT:  With respect to any conditions that I

14    might impose, either as conditions of probation or supervised

15    release, the probation officer's included a number of standard

16    conditions.  She's also recommended that he complete 100 hours

17    of community service.

18          Given the nature of the crime, I'm also inclined to include

19    a condition with respect to future computer use specifically.

20    I'm inclined to require Mr. Pinedo to pay for a computer program

21    that would monitor his computer use to ensure that it's not

22    being used for criminal activity.

23          Does the government have a position on those conditions or

24    any others?

25          MR. ATKINSON:  We find, in particular, the computer

1    condition would be appropriate in this case, given Mr. Pinedo's

2    previous history over the four years.  We think all of those

3    conditions would be appropriate.

4         THE COURT:  All right.  Thank you very much.

5         Mr. Lessem, is there anything else you would like to add

6    about Mr. Pinedo's sentencing with respect to either 3553(a)

7    factors, conditions of release, or anything else?

8         MR. LESSEM:  Just a few things.  Thank you, your

9    Honor.

10        I think under 3553(a) and (b), what the Court is looking at

11   in determining a sentence that's either above or below the

12   guidelines is whether or not there's some type of aggravating or

13   mitigating circumstances that the guidelines don't adequately

14   take into consideration.  And I think that one of the things

15   that we stressed in our sentencing brief to the Court is

16   certainly there are factors relating to both the circumstances

17   of the offense, as well as the circumstances of the defendant

18   that would apply under these statutes.

19        With respect to the offense itself, I think a lot of times,

20   and clearly not all the time but a lot of time, these types of

21   cases you're looking at somebody who is committing a direct

22   theft, stealing from people, getting their identities and taking

23   money out of people's accounts or in other ways directly causing

24   losses to individuals.  And that wasn't the case here.

25        As the People point out in their sentencing brief, he

wasn't directly stealing this information, taking information, personal information from others but, rather, more serving as a middleman.  That doesn't preclude his culpability in any way. That's, obviously, not a defense to the charges, but I think it does have some effects under 3553 that the Court can consider in terms of the circumstance of the offense.

With respect to the defendant, we've already spoken about his cooperation and how the Court can consider that.  I would also ask the Court to consider the unusual circumstances surrounding this case and how that has affected the defendant already and his family and consider that as a characteristic that can be considered under 3553(a).

His life has been turned upside down by this.  And I'm not saying this to the Court to garner some type of sympathy for the defendant.  Clearly, he doesn't deserve sympathy.  He committed a crime, and the Court's job is to punish him for that.  But it is outside the norms of what one would expect in a case like this.  If it wasn't for the fact that, perhaps, some of his co-conspirators or clients or whatever you want to call them happened to be caught up in this investigation, this is likely something that could have been handled in state court, in Superior Court of Los Angeles County.

THE COURT:  You don't know what other things could come forward for other folks who have done other activity.  It's at this point hard to say if he literally sold hundreds of bank

accounts.  It's hard to predict that this is the worst among.
We don't know.  We really don't know.

MR. LESSEM:  We don't know.  I agree with the Court.
I think that, obviously, his conduct allowed for potentially
dangerous behavior to take place.  Whether the defendant thought
that through, was aware what people could or were doing is a
question that clearly he should have thought about more.

But the fact is that since this has happened to him, he's
really had -- I spoke to his father this morning, your Honor, on
the way to court.  They're going to have to sell their family
home of 20-plus years, move out of the community that they've
lived in.  They can't be there anymore.

Before coming to -- before flying out to D.C. from
California, I got to watch on the Internet as a local newspaper
online published the actual front of his house with the address
on video, including the street corner signs.

He gets it from both sides.  On the one hand, there are
people who have contacted him directly or posted online that he
is a traitor to the country because he works with the Russians,
and then there are other people who are telling him or who have
indicated that he's got to watch his back because he's
cooperating with the FBI against the Russian government.

He's getting it from all sides.  It's affected his life in
ways that, I think, would never have been contemplated by the
guidelines for a typical offense of this nature.  It's going to

1    change his life forever in ways that not normally would be under

2    the consideration in cases like this.  And I think that it's

3    something the Court can take into consideration as a factor.  I

4    think it's something the Court should take into consideration in

5    fashioning a sentence, is understanding how he's already been

6    affected by this.

7        I think everything else, your Honor, in terms of his

8    proffer, his testimony in front of the grand jury, his

9    willingness to do that without immunity is something that the

10   Court's already asked about and talked about.  I would just once

11   again stress those factors as well.

12           THE COURT:  Thank you, Mr. Lessem.

13       Mr. Pinedo, you have the right to make a statement.  Is

14   there anything you would like to say to the Court?

15           THE DEFENDANT:  Yes.  Hello, your Honor.

16       I want to start by telling the Court that I take full

17   responsibility for what I have done and what I have caused to

18   those who are involved as a result of my actions.

19       Throughout the life of the business, I was convinced that

20   the services I was offering put no one at risk or that I was

21   stealing from anyone.  What I now understand that, after all

22   this, that was not the case.  By helping people open fake

23   accounts on PayPal, I was helping them commit fraud and

24   potentially other crimes on many different levels.  Never did it

25   cross my mind that the services I would be offering be used in

crimes to the highest degree, as I witness and come to find out through this investigation.

Your Honor, I understand that there needs to be consequences for my actions.  In deciding what those consequences should be, I want the Court to understand how this case has already impacted my life.

Prior to this case, I lived a very quiet life in Santa Paula, California, where my parents worked extremely hard my entire life to give me and my siblings a comfortable life.  I always tried to be respectful of my parents and never got into any trouble growing up.

I graduated high school early and went to community college to study computers and got several certifications as well.  All my goal was to do was to own my own company in the computer industry and be able to provide jobs to my local community.

This quiet anonymous life that has now been completely turned upside down, having been portrayed in the media as somebody who was involved in a turning point in an American election, has had a drastic impact both financially and emotionally on myself and my family.  Not knowing who is knocking on your door or what their intentions are is an extremely unsettling feeling.  People who you have been good friends with or on good terms with suddenly have a change in attitude after discovering my involvement in this investigation. I have seen accusations posted online saying that I'm a Russian

agent, while I have other people tell me that if I ever leave
the country, the Russians will poison me for cooperating against
them with the FBI.  People have even posted threatening messages
online about how they want to harm me.

While all this is going on, my personal information has
been posted all over the Internet.  Even the local newspaper in
my community has posted a video online showing the intersection
where I live, as well as my dad going in.  They even show the
front door and everything about where my family lives.  Every
knock on the door now comes with anxiety about who it may be or
if they wish to do harm to me and my family.  It has come to the
point where just leaving my house to run errands has become
extremely stressful.

However, what's even worse as what happened to me is what
my family had to go through, especially my father, who shares
the same name and who is also in the Court with us.  As a
result, he's often been mistaken as a person involved in this
case.  This has caused him a great deal of problems at work.
He's been harassed at work, and there have been clients of his
boss who demanded that he be fired because he's a traitor to
this country.

All he has tried to do is support me both emotionally and
financially throughout this process, and he does not deserve to
be thrown in the mix for what I have done.  I want to apologize
to my entire family for all the grief and pain that my actions

1  have caused.

2       Ever since this whole thing started, I've tried to be

3  completely honest.  I've complied with everything the FBI and

4  the prosecutors have asked me to do.  I testified in front of

5  the grand jury and told them the truth.  I have handed over

6  every document and spreadsheet that the FBI asked for.  I have

7  tried to do everything possible that I can to help in this

8  investigation.  I hope that what I have done has helped, but I

9  also know nothing I can do can ever fix the mistakes I have

10  made.

11       Your Honor, thank you for taking the time to listen to me.

12  Thank you.

13            THE COURT:  Thank you, Mr. Pinedo.  I really

14  appreciate your remarks.

15            THE DEFENDANT:  Thank you.

16            THE COURT:  I will now indicate the sentence to be

17  imposed, but counsel on both sides will have a last opportunity

18  to make any legal objections before the sentence is actually

19  imposed.

20       Mr. Pinedo, I would ask you and Mr. Lessem to come to the

21  lectern.

22       Mr. Pinedo, this is a very, very difficult case.  On the

23  one hand, you've committed a serious crime, identity theft on a

24  widespread scale.  For more than three years, you've

25  intentionally and repeatedly purchased and sold bank account

1  numbers that belonged to real people that had real consequences

2  for those people.  You circumvented critical identification

3  authentication systems of financial companies that are designed

4  to prevent fraudulent schemes of all types, and you did so for

5  significant financial gain.  During the course of these three

6  years, the evidence before the Court is you made somewhere

7  between $40,000 and $95,000.

8      And while I very much appreciate the fact that you may not

9  have known about the specific fraud schemes that you

10  facilitated, you did knowingly commit identity fraud, and you

11  opened the door for others to access U.S. financial networks

12  anonymously and to commit serious crimes without easy detection.

13      On the other hand, in this case there are a number of

14  significant mitigating factors that weigh in your favor.  They

15  include your immediate and complete acceptance of

16  responsibility, your timely, truthful, and significant

17  cooperation, your lack of any criminal record, and your age.

18      As soon as federal agents knocked on your door in 2017, you

19  immediately admitted wrongdoing, and you agreed to cooperate,

20  and I commend you for that.  I can tell that you're generally

21  remorseful for your actions.  And it's most unfortunate that

22  your cooperation in this case did not result in a motion by the

23  government.  But as I've said earlier, that was a decision

24  that's within the sole discretion of the government, and I

25  cannot review it.

1        That said, however, in my mind, it is a significant

2   mitigating factor that I am considering in deciding what

3   sentence to impose.  I think you deserve credit for your

4   cooperation.  As the government has represented, you've provided

5   significant and truthful cooperation.  You've implicated others

6   in various criminal schemes that have yet to have been charged.

7   You explained the fraud scheme in this case such that financial

8   institutions have taken steps to address the vulnerabilities of

9   identification authentication systems.  You testified before the

10  grand jury in a related case.  You saved the government

11  significant time and resources in its investigation of the

12  related case.  And you've also indicated through your plea

13  agreement a willingness to testify in any future trials.

14       I also note you are 28 years old, and you have never been

15  involved in the criminal justice system, with the exception of

16  one traffic infraction.  You have no criminal record, not a

17  single prior arrest.

18       Your father's letter that I've reviewed makes clear that

19  you've never previously been in any kind of trouble.  In his

20  words, you have been a great son.  He says you've never been in

21  a fight, abused drugs or alcohol.  You've played a significant

22  role in the upbringing of your younger siblings.

23       And I'm very sorry for the significant hardship that this

24  case has caused both you and especially your family.  I'm

25  especially sorry for the harassment and the threats they've

1    experienced as a result of this case.

2        But Mr. Pinedo, you've made a significant mistake or,

3    really, a series of mistakes that have brought you here today.

4    You have a great deal going for you.  You're a bright, capable

5    young man who has a very supportive family, and you're very

6    lucky to have that.  You're just a few hours from completing

7    your college degree, and I encourage you, during the course of

8    serving this sentence, to take steps to complete that.  That

9    will enhance your opportunities after this case is over.

10       Based on my consideration of the sentencing guidelines and

11   all of the factors, 3553(a), I do believe that a sentence of

12   incarceration is appropriate in this case.  I also believe that

13   a sentence at the low end of the guideline range is appropriate,

14   and in this case, because your sentencing guideline range falls

15   within zone C of the sentencing table pursuant to Section 5C1.1

16   of the sentencing guidelines, the minimum term of imprisonment

17   may be satisfied by a sentence of imprisonment that includes a

18   term of release with the condition that substitutes home

19   detention for imprisonment, provided that at least half of the

20   minimum term -- in this case I will impose the low end of the

21   guideline range, which is one year -- is served in prison.

22       I've considered all the types of sentences available under

23   zone C, and I find that a sentence of imprisonment with a period

24   of home detention followed by a period of supervised release is

25   appropriate.

1     I find it's impracticable to impose restitution in this

2     case.  I also find that you do not have the ability to pay a

3     fine.

4          Therefore, it is the judgment of the Court that you,

5     Richard Pinedo, are hereby committed to the custody of the

6     Bureau of Prisons for a term of imprisonment of one year on

7     Count 1.  You are further sentenced to serve 24 months, or two

8     years, of supervised release and pay a $100 special assessment.

9          Pursuant to Section 5C1.1(d)(2) of the sentencing

10    guidelines, you will serve a term of supervised release that

11    includes a condition of home detention.  So this means that you

12    will serve six months in the Bureau of Prisons followed by six

13    months of home detention.

14         As I've said, I do find that you do not have the ability to

15    pay the fine.  Therefore, I waive imposition of a fine in this

16    case.  The special assessment is immediately payable to the

17    Clerk of Court for the U.S. District Court for the District of

18    Columbia.  Within 30 days of any change of address, you shall

19    notify the Clerk of Court of the change until such time as the

20    financial obligation is paid in full.

21         Within 72 hours of release from custody, you shall report

22    in person to the Probation Office, and in this case you will be

23    supervised in your home district.  While on supervision, you

24    shall submit to the collection of DNA.  You shall not possess a

25    firearm or other dangerous weapon.  You shall not use or possess

1    an illegal controlled substance, and you shall not commit

2    another federal, state, or local crime.

3        You shall also abide by the general conditions of

4    supervision adopted by the U.S. Probation Office, as well as the

5    following special conditions:  First, location monitoring.  You

6    will be monitored in the form of location monitoring technology

7    for a period of six months, and you must follow the rules and

8    regulations of the location monitoring program.  You must pay

9    the costs of the program.

10       Location monitoring technology at the discretion of the

11   probation officer, including radio frequency monitoring, GPS

12   monitoring, or voice recognition, this form of location

13   monitoring technology will be used to monitor the following

14   restriction on your movement in the community:  You will be

15   restricted to your residence at all times except for employment,

16   education, religious services, medical, substance abuse, or

17   mental health treatment, attorney visits, court appearances,

18   court-ordered obligations, or other activities preapproved by

19   the officer.

20       In addition, I will impose a condition of computer

21   monitoring that the Probation Office will propose, and that will

22   be at your expense.  The Probation Office shall release a

23   presentence investigation report -- one other.  You must

24   complete 100 hours of community service within 18 months of

25   release.  The probation officer will supervise the participation

1    in the program by approving it.  You must provide written

2    verification of completed hours to the Probation Office.

3         The Probation Office will release a presentence

4    investigation report to all appropriate agencies.  In order to

5    execute the sentence of the Court, treatment agencies shall

6    return the presentence report to the Probation Office upon your

7    completion or termination from treatment.

8         Pursuant to 18 U.S.C. Section 3742, you do have a right to

9    appeal the sentence imposed by this Court if the period of

10   imprisonment is longer than the statutory maximum or the

11   sentence departs upward from the applicable sentencing guideline

12   range.  If you choose to appeal, you must file any appeal within

13   14 days after the Court enters judgment.  As defined in 28

14   U.S.C. Section 2255, you also have the right to challenge the

15   conviction entered or the sentence imposed if new and currently

16   unavailable information becomes available to you or on a claim

17   that you received ineffective assistance of counsel in entering

18   a plea of guilty to the offensive conviction or in connection

19   with the sentencing.  If you are unable to afford the cost of

20   appeal, you may request permission from the Court to file an

21   appeal without cost to you.

22        I will now ask both parties if either side has any

23   objections to the sentence imposed that have not already been

24   noted on the record?

25             MR. ATKINSON:  None from the government, your Honor.

1          MR. LESSEM:  No, your Honor.

2          THE COURT:  All right.  Anything from the Probation

3    Office?

4          PROBATION OFFICER:  No, your Honor.

5          THE COURT:  Is there anything else that we should

6    handle here?  Oh, I will allow -- I assume the government has no

7    objection to allowing the defendant to voluntarily surrender?

8    He's complied with all of his conditions of release --

9          MR. ATKINSON:  No, your Honor.

10          THE COURT:  -- since he's been under the jurisdiction

11    of the Court.

12          MR. ATKINSON:  No, your Honor, we have no objection to

13    voluntary surrender.  We think the conditions that were imposed

14    pretrial and pending sentence are appropriate in this case.

15          THE COURT:  Mr. Lessem, any special requests?

16          MR. LESSEM:  Yes, your Honor.  In addition to setting

17    a surrender date, the defense would also like to inquire as to

18    allowing the defendant to surrender in his home district,

19    Central District of California, as opposed to having to come out

20    to D.C.  That's where his family is located.

21          THE COURT:  Yes, of course, he may do so.  Yes, he

22    may.

23          MR. LESSEM:  Okay.

24          THE COURT:  Any other recommendations that you would

25    like the Court to make to the Bureau of Prisons?

1          MR. LESSEM:  No, your Honor.  I don't believe there's

2   any special accommodations that are required in this case.

3          THE COURT:  All right.  Anything else we need to

4   address?

5      I'm going to ask that Mr. Pinedo surrender at a date

6   determined by the Federal Bureau of Prisons and the Probation

7   Office, that you will work with them.

8          MR. LESSEM:  So I'm assuming that we will be able to

9   contact Probation and figure out the logistics of how that's

10  going to work in --

11         THE COURT:  Of course.  And the probation officer is

12  here in the courtroom, and she can work with you to make sure we

13  are clear on where you need to go from here.

14     I want to make clear, though, although he's going to be

15  supervised in his home district, I am retaining jurisdiction

16  over this case.  So to the extent that there are any motions for

17  modifications of conditions of supervised release, they need to

18  come to me.

19         MR. LESSEM:  Understood.

20         THE COURT:  Anything else?

21         MR. ATKINSON:  None from the government.

22         THE COURT:  Mr. Pinedo, I wish you luck.

23         MR. LESSEM:  Thank you, your Honor.

24         THE COURT:  Thank you.

25     (Proceedings adjourned at 10:54 a.m.)

| | |
|---|---|
| 1 | CERTIFICATE OF OFFICIAL COURT REPORTER |
| 2 | |
| 3 | I, Sara A. Wick, certify that the foregoing is a |
| 4 | correct transcript from the record of proceedings in the |
| 5 | above-entitled matter. |
| 6 | |
| 7 | |
| 8 | |
| 9 | /s/ Sara Wick                          October 10, 2018 |
| 10 | SIGNATURE OF COURT REPORTER          DATE |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |